UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JON RIVERA,

        Plaintiff,                                 Case No. 16-cv-13786

vs.                                                  HON. MARK A. GOLDSMITH

FORD MOTOR COMPANY,

        Defendant.
_____/

## OPINION & ORDER
## GRANTING IN PART AND DENYING IN PART DEFENDANT'S
## MOTION TO DISMISS (Dkt. 13)

This matter is before the Court on Defendant Ford Motor Company's motion to dismiss (Dkt. 13). Plaintiff Jon Rivera has brought this action on behalf of himself and a class of current and former owners of 2012-2015 Ford Focus vehicles that were allegedly sold with defective evaporative emission control ("EVAP") systems. These defective systems allegedly caused the vehicles to stall while in a motion, a condition that Rivera alleges Ford was aware of at the time of sale. For the reasons stated below, the Court grants in part and denies in part Ford's motion.

### I. BACKGROUND

In May 2013, Plaintiff John Rivera purchased a new 2013 Ford Focus SE from Desoto Ford in Arcadia, Florida. Am. Compl. ¶ 15 (Dkt. 12). In October 2016, nearly three and a half years after his purchase, Rivera began experiencing erratic idling in his vehicle. Id. ¶ 17. This issue worsened; in one incident, the vehicle began to stall while traveling fifty miles per hour. Id. Rivera also noticed that the vehicle's fuel gauge was erratic, with fuel levels changing from a quarter tank full to three-quarters full in an instant. Id. A repair technician at Charlotte County Ford subsequently informed Rivera that his vehicle required replacement of the fuel vapor valve,

1

fuel tank, and fuel pump. Id. at 18. After being quoted a repair cost of approximately $1,927.50, Rivera was informed that the repairs would not be covered under the terms of Ford's warranties. Id.

Rivera then went to Desoto Ford, the dealership where he purchased the vehicle, and requested that the dealership repair the vehicle under warranty. Id. ¶ 19. The dealership informed Rivera that it was aware of a problem with the Ford Focus's EVAP but that any repairs would not be covered under the factory warranty. Id.

The vehicle's EVAP is designed to limit fuel emissions, produced in the fuel tank, from entering the atmosphere. Id. ¶ 29. The vehicle is designed so that vapors emitting from the fuel tank travel to a canister containing charcoal. Id. ¶ 30. The charcoal absorbs the fuel vapor for storage purposes. Id. When the car is running, the fuel vapors stored in the canister are funneled to the engine to be purged. Id. ¶ 31. This prevents the fuel vapors from being released as emissions. Id.

The vehicle's purge valve, the part at issue here, regulates how much fuel vapor enters the engine by opening or closing as needed. Id. ¶ 32. An electronically-operated solenoid, controlled by the vehicle's engine computer, determines when the purge valve should allow fuel vapors to enter the engine. Id. Generally, the solenoid opens the purge valve when the vehicle is running and fully warmed up. Id. When the engine is off, the purge valve is shut, meaning no fuel vapors should enter the engine. Id. When the purge valve becomes stuck in the open position, like with Rivera's and the rest of the putative class members' vehicles, suction is created when the vehicle's engine is running. Id. ¶ 36. As a result, in addition to fuel vapors, raw fuel is sucked through the EVAP canister, through the purge valve, and directly into the engine. Id. This raw fuel causes the engines in the class vehicles to abruptly hesitate and stall while driving. Id. Other putative class

members have reported loss of engine power when traveling in excess of forty-five miles per hour. Id. ¶ 37. In addition to the loss of engine power, Ford technicians have determined that the purge valve has caused fuel tanks to collapse due to raw fuel leaving the tank rapidly. Id. ¶ 39.

In light of Desoto Ford's statement regarding issues with the purge valve, Rivera called Ford directly and requested a repair under warranty. Id. ¶ 20. After declining his request, Ford informed Rivera that he could decline paying for repairs and wait to see if Ford decided to issue a recall on the purge valves. Id. ¶ 20. Rivera subsequently paid $226.14 to have his purge valve fixed, but has not driven it since because he believes it is not fit for regular and safe operation. Id. ¶ 22.

**A. Ford's Knowledge of the Defective Purge Valve**

Rivera alleges, "upon information and belief," that Ford was aware of the EVAP defect through the following: (i) Ford's own records of consumer complaints; (ii) dealership repair records; (iii) records from the National Highway Traffic Safety Administration ("NHTSA"); (iv) warranty and post-warranty claims; and (v) its own internal Technical Service Bulletins ("TSB"). Id. ¶ 41. As an example, Rivera alleges that Ford issued a TSB to its authorized dealerships in March 2015 regarding inaccurate fuel gauge and inaccurate distance-until-empty readings in the putative class members' vehicles. Id. ¶ 42. In the TSB, Ford told dealers to replace the purge valve, the evaporative emission canister, the fuel tank, and/or the fuel pump module if the consumer complained of an inaccurate fuel gauge or inaccurate distance-until-empty reading. Id. ¶ 43. Rivera also alleges that "[a]s experienced manufactures [sic] Ford likely conducts tests on incoming components, including the EVAP system, to verify the parts are free from defect and align with Ford's specifications." Id. ¶ 44. Thus, according to Rivera, "Ford knew or should have known the EVAP system was defective." Id.

Rivera also alleges that Ford should have learned of the defective EVAP system "due to the sheer number of reports received from dealerships." Id. ¶ 45. Ford received numerous reports from dealerships that customers were experiencing issues with the EVAP system. Id. These complaints ultimately led to the release of the TSB. Id. Ford's customer relations department also collects and analyzes field data, including repair requests made at dealerships, technical reports prepared by engineers, parts sales reports, and warranty claims data. Id. Ford's warranty department also analyzes data submitted by its dealerships in order to identify trends in its vehicles. Id. ¶ 46. When a repair is made under warranty, dealerships must provide Ford with detailed documentation of the problem and the fix employed to correct it. Id.

Finally, Rivera alleges that the NHTSA's office of defects investigation has received complaints regarding the class vehicles' EVAP systems. Id. ¶ 52. Rivera lists six examples of these complaints, which were filed between May 5, 2015 and July 31, 2016. Id.

**B. Ford's Warranties**

Ford issues the following warranties with each class vehicle: (i) a new vehicle limited warranty; (ii) a powertrain warranty; (iii) an emissions defect warranty; and (iv) an emissions performance warranty. Id. ¶ 47. Under the new vehicle limited warranty, Ford agrees to repair defects reported within the earlier of 3 years or 36,000 miles. Id. ¶ 48. Under the powertrain warranty, Ford agrees to repair defects affecting various powertrain components within the earlier of 5 years or 60,000 miles. Id. ¶ 49. Federal law requires vehicle manufacturers to supply a minimum 2 year or 24,000 mile emissions defect warranty, which covers any covered parts that fail to function due to manufacturing errors, and a 2 year or 24,000 mile emissions performance warranty, which covers repairs necessitated due to a failed emissions test. Id. ¶ 50. Finally, vehicle manufacturers must also issue an 8 year or 80,000 mile emissions defect warranty on certain

4

emission system parts. Id. ¶ 51. Rivera alleges that repairs associated with the EVAP system should be included in these and other warranties. Id. ¶¶ 48-51.

In its motion, Ford argues that the 8 year or 80,000 mile emission defect warranty on certain emission system parts and the 5 year or 60,000 mile warranty on certain powertrain components are not applicable. Def. Mot. at 6 (Dkt. 13). It notes that the 8 year or 80,000 mile warranty is, by its terms, only applicable to repairs of the catalytic converter, the electronic emissions control unit, and onboard emissions diagnostic devices. See Warranty Guide, Ex. A to Def. Mot., at 18 (Dkt. 13-1). The class vehicles' purge valve is not listed. Id. It also is not listed in the components covered by the 5 year or 60,000 mile warranty. Id. at 10-11.

## II. STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. "In ruling on a motion to dismiss, the Court may consider the complaint as well as . . . documents referenced in the pleadings and central to plaintiff's claims." Knight v. Bank of Am., No. 16-11662, 2016 WL 6600041, at *3 (E.D. Mich. Nov. 8, 2016). Because the express warranty is referenced in the pleadings and is central to many of Rivera's claims, it will be considered in the Court's ruling.

## III. ANALYSIS

5

**A. Choice of Law**

In their pleadings, the parties do not address whether the Court must apply the laws of each consumer's state to their claims, or whether each claim can be analyzed under Michigan law, the state of which Ford is a citizen. Ford only briefly argues in its motion that, under Michigan's choice of law rules, Florida law applies to Rivera's individual claims. Because of "the minimal attention given to this issue by both parties," and because Florida and Michigan law do not conflict at this stage of the proceedings, no choice-of-law analysis is necessary. Hitachi Med. Sys. Am., Inc. v. Branch, No. 5:09-CV-01575, 2010 WL 816344, at *5 (N.D. Ohio Mar. 4, 2010). The Court will thus analyze each claim under both Florida and Michigan law, as the parties have done.

**B. Express Warranty**

Ford first argues that Rivera's express warranty claim should be dismissed because he has not alleged a failure or malfunction within any of the relevant warranty periods. Despite alleging in his complaint that all class vehicles were covered by four separate warranties, Rivera, in his response to Ford's motion, does not rebut Ford's claim that none of the warranties is applicable. Instead, Rivera argues that the limitations imposed on the warranties were unconscionable.

A plaintiff must allege both substantive and procedural unconscionability when claiming a breach of warranty based on the theory of unconscionability. Pendergast v. Sprint Nextel Corp., 592 F.3d 1119, 1134 (11th Cir. 2010). However, these elements "need not be present in the same degree." Basulto v. Hialeah Auto., 141 So. 3d 1145, 1159 (Fla. 2014) (quotation marks omitted); see also Whirlpool Corp. v. Grigoleit Co., 713 F.3d 316, 321 (6th Cir. 2013). Courts use a "sliding scale" when determining the existence of unconscionability. Basulto, 141 So. 3d at 1159. "In other words, the more substantively oppressive the contract term, the less evidence of procedural

unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." Id.

"A contract is substantively unconscionable if its provisions are so outrageously unfair as to shock the judicial conscience." Licul v. Volkswagen Grp. of Am., Inc., No. 13-61686-CIV, 2013 WL 6328734, at *3 (S.D. Fla. Dec. 5, 2013). It cannot be said that the terms of the express warranty here were substantively unconscionable. The court in Licul, addressing whether a 2 year or 24,000 mile warranty was unconscionable, noted that the plaintiffs had not even pleaded substantive unconscionability. The court stated that this failure to plead was "understandable given that such limitations are both common in the industry and routinely enforced by the courts." Id.; see also In re OnStar Contract Litig., 278 F.R.D. 352, 385 (E.D. Mich. 2011) (noting that "the vast majority of courts . . . have ruled that any alleged 'defect' that occurs outside of the time or mileage limits of the applicable written warranty may not be the basis for an express warranty claim" and only allowing express warranty claims to proceed based on allegations of unconscionability as to those plaintiffs proceeding under West Virginia law, a state with a minority view). Because Rivera cannot demonstrate substantive unconscionability, his express warranty claim fails.

Even if Rivera could demonstrate substantive unconscionability, he would still have to establish procedural unconscionability. Courts applying Florida law consider the following:

> (1) the manner in which the contract was entered into; (2) the relative bargaining power of the parties and whether the complaining party had a meaningful choice at the time the contract was entered into; (3) whether the terms were merely presented on a "take-it-or-leave-it" basis; and (4) the complaining party's ability and opportunity to understand the disputed terms of the contract.

PB Prop. Mgmt., Inc. v. Goodman Mfg. Co., L.P., No. 3:12-CV-1366-J-20JBT, 2013 WL 12172912, at *4 (M.D. Fla. Aug. 28, 2013).

7

Rivera's claim of procedural unconscionability rests on whether Ford had presale knowledge of the defective purge valve. Rivera cites to Goodman, where the court held that, "under Florida law, a warranty limitation may be unconscionable when a defect is latent and the manufacturer knows that the product's effectiveness is questionable." Id. at *5. Ford cites to Licul, where the court held that "[a] defendant's knowledge of a latent defect at the time of sale, however, does not salvage a claim for breach of express warranty where the warranty has expired before the defect manifests." Licul, 2013 WL 6328734, at *2. The court noted that "[V]irtually all product failures discovered in automobiles after the expiration of the warranty can be attributed to a 'latent defect' that existed at the time of sale or during the term of the warranty." Id. (quoting Abraham v. Volkswagen of Am., Inc., 795 F.2d 238, 250 (2d Cir. 1986)). "Manufacturers are aware of these potential failures and consider them in pricing and setting limitations upon warranties. To hold that a manufacturer's knowledge of potential failures renders such limitations unenforceable would thus 'render meaningless time/mileage limitations in warranty coverage,' and would be contrary to the overwhelming weight of precedent enforcing such limitations." Id. (quoting Abraham, 795 F.2d at 250). Abraham appears to represent the majority view. See, e.g., Chiarelli v. Nissan N. Am., Inc., No. 14-CV-4327 NGG VVP, 2015 WL 5686507, at *7 (E.D.N.Y. Sept. 25, 2015) ("The case law is clear . . . [that] a defendant's knowledge of a latent defect does not render unconscionable a limitation contained in an express warranty."); Hart v. Louisiana-Pac. Corp., 641 F. App'x 222, 228-229 (4th Cir. 2016). Even assuming presale knowledge was sufficiently pleaded, such knowledge, standing alone, is insufficient to establish procedural unconscionability.

**C. Covenant of Good Faith and Fair Dealing**

8

Ford next argues that Rivera's claim for breach of the implied covenant of good faith and fair dealing should be dismissed because Michigan law does not recognize such a claim. It also argues that a claim does not lie under Florida law because the covenant cannot be used to override the express contractual term that Ford was only obligated to repair defects within the warranty period. It also notes that the covenant cannot be used to create a breach of contract where there is no breach of an express term. In response, Rivera does not address whether the covenant is recognized under Michigan law. Instead, he argues that Ford breached its duty of good faith and fair dealing under Florida law when it acted in bad faith to deny repairs for the defective purge valves.

"Unlike some other jurisdictions, Michigan does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing." In re Leix Estate, 797 N.W.2d 673, 683 (Mich. Ct. App. 2010) (citation and quotation marks omitted). However, Florida does recognize this implied covenant. Florida courts have held that:

> [T]he implied covenant of good faith and fair dealing is designed to protect the contracting parties' reasonable expectations . . . [t]hus, where the terms of the contract afford a party substantial discretion to promote that party's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

Cox v. CSX Intermodal, Inc., 732 So. 2d 1092, 1097-1098 (Fla. Dist. Ct. App. 1999). While the covenant of good faith and fair dealing exists under Florida law, "the reach of this implied contractual covenant is restricted in several respects." Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A., 896 So. 2d 787, 791 (Fla. Dist. Ct. App. 2005). "First, the implied covenant is not an independent term within the parties' contract. Thus, it cannot override an express contractual provision." Id. Second, "[t]here can be no cause of action for a breach of the implied

covenant absent an allegation that an express term of the contract has been breached." Id. at 792. Finally, a cause of action based on the covenant will not lie where the allegations underlying the claimed breach are duplicative of those which support the claim for breach of contract. Burger King Corp. v. Weaver, 169 F.3d 1310, 1318 (11th Cir. 1999).

The covenant is instead "an interpreting, gap-filling tool of contract law." Shibata v. Lim, 133 F. Supp. 2d 1311, 1318 (M.D. Fla. 2000). "It determines when a party, although not breaching the terms of the contract in a technical sense, may no longer pursue its own self-interest at the other party's expense." Enola Contracting Servs., Inc. v. URS Grp., Inc., No. 5:08CV2-RS-EMT, 2008 WL 1844612, at *3 (N.D. Fla. Apr. 23, 2008). "That situation ordinarily arises when: 1) the contract is ambiguous about the permissibility of the conduct, or 2) when the conduct is undertaken pursuant to a grant of discretion and the scope of that discretion has not been designated." Shibata, 133 F. Supp. 2d at 1318. "When, however, the express terms of the contract determine the permissibility of the conduct, no gap-filler is needed and the covenant does not apply." Id. at 1319.

As noted above, Rivera does not contest that Michigan law does not recognize the implied covenant of good faith and fair dealing. He instead argues that Ford violated the implied covenant under Florida law "when it arbitrarily, capriciously, and in bad faith refused to approve the EVAP Defect repairs for Class members." Pl. Resp. at 12 (Dkt. 16). This argument is unavailing. The warranty does not leave any room for discretion in the parties' performance; its express terms determine the permissibility of their conduct. Shibata, 133 F. Supp. 2d at 1319. If a defect occurred within the first 3 years or 36,000 miles, Ford was obligated to make repairs.[1] If an issue

---

[1] As noted by Ford, the allegedly defective component at issue here, the purge valve, is not covered by the 5 year or 60,000 miles warranty or the 8 year or 80,000 mile warranty. See Warranty Guide at 10-11, 18. Neither warranty lists the purge valve as one of the components to be repaired. See id. While Rivera lists these warranties in his amended complaint, he does not argue that they are applicable in his response to Ford's motion; he only argues that the warranties are unconscionable.

arose outside of those parameters, Rivera was responsible for any necessary repairs. The implied covenant of good faith and fair dealing did not apply to override the terms of the warranty to require Ford to make repairs to Rivera's vehicle in October 2016, three years and five months after he purchased his vehicle. See Snow, 896 So. 2d at 791.

As a result, Rivera's claim for breach of the covenant of good faith and fair dealing fails.

**D. Unjust Enrichment**

Rivera states in his response that the putative class voluntarily dismisses with prejudice its unjust enrichment claim under Michigan law. Pl. Resp. at 23. The Court will, therefore, only analyze whether Rivera has sufficiently pleaded a claim of unjust enrichment under Florida law.

A claim for unjust enrichment under Florida law requires "(1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." United Techs. Corp. v. Mazer, 556 F.3d 1260, 1270 (11th Cir. 2009). "No cause of action in unjust enrichment can exist where the parties' relationship is governed by an express contract." Zarrella v. Pac. Life Ins. Co., 755 F. Supp. 2d 1218, 1227 (S.D. Fla. 2010). "Though Rule 8 permits alternative pleading, 'an unjust enrichment claim can only be pled in the alternative if one or more parties contest the existence of an express contract governing the subject of the dispute.'" Id. (quoting In re Managed Care Litig., 185 F. Supp. 2d 1310, 1337-1338 (S.D. Fla. 2002)).

In its motion, Ford argues that there cannot be an unjust enrichment claim because the express warranty governs this dispute. Rivera argues that "the warranty agreement is not at issue under this claim" because he has alleged that "Ford was unjustly enriched when . . . the Class Vehicle [was purchased] due to Ford's false representations regarding its capabilities and value."

11

Pl. Resp. at 12. In support of this claim, Rivera notes his allegation in count three of the amended complaint which states that Ford "expressly warranted that the Class Vehicles were of high quality and, at a minimum, would work properly." Id. (citing Am. Comp. ¶ 97). However, count three of the amended complaint is a claim for breach of the express warranty. Indeed, in the next paragraph, Rivera specifically alleges that Ford "breached this warranty by selling to Plaintiff and Class members the Class Vehicles with known EVAP system problems, which are not of high quality, and which fail prematurely and/or fail to function properly." Am. Compl. ¶ 98. Rivera can hardly claim that the express warranty does not govern this issue, when he explicitly alleges in the amended complaint that Ford's representations regarding the quality of the class vehicles constituted a breach of the express warranty.

Rivera argues that even if the express warranty governs this issue, Federal Rule of Civil Procedure 8(a)(3) permits pleading in the alternative, even if the theories are inconsistent. In support of this contention, Rivera cites to authority under Florida law that holds a claim of unjust enrichment may survive a motion to dismiss when it is brought alongside a claim for breach of contract. See In re Checking Account Overdraft Litig., 694 F. Supp. 2d 1302, 1321 (S.D. Fla. 2010) ("Defendants have not conceded that Plaintiffs are entitled to recovery under the contract, and it is possible that if their contractual claim fails, Plaintiffs may still be entitled to recovery under an unjust enrichment theory."); see also Williams v. Bear Stearns & Co., 725 So. 2d 397, 400 (Fla. Dist. Ct. App. 1998) ("It is only upon a showing that an express contract exists that the unjust enrichment or promissory estoppel count fails. Until an express contract is proven, a motion to dismiss a claim for promissory estoppel or unjust enrichment on these grounds is premature.").

The cases relied upon by the court in In re Checking dealt with instances where the existence of a contract had not yet been established or the contract was established and did not

apply to certain goods. See Tracfone Wireless, Inc. v. Access Telecom, Inc., 642 F. Supp. 2d 1354, 1366 (S.D. Fla. 2009); Manicini Enterprises, Inc. v. Am. Exp. Co., 236 F.R.D. 695, 699 (S.D. Fla. 2006); Mobil Oil Corp. v. Dade Cty. Esoil Mgmt. Co., 982 F. Supp. 873, 880 (S.D. Fla. 1997). In Williams, the Court held that unjust enrichment claims were properly dismissed as to those defendants who did not dispute the existence of a contract. Williams, 725 So. 2d at 400.[2]

Because the express warranty governs the claims at issue, Rivera's unjust enrichment claim fails.

**E. Fraud**

Ford also argues that Rivera's common law fraud claim should be dismissed because he has not alleged a duty to disclose the alleged defective purge valve under either Florida or Michigan law. Rivera argues that Florida law required disclosure of the defect in light of the parties' contractual relationship. He also contends that, under Michigan law, Ford had a duty to disclose information that he could not have reasonably been made aware of.

Under Florida law, "[a] defendant's knowing concealment or non-disclosure of a material fact may only support an action for fraud where there is a duty to disclose." TransPetrol, Ltd. v. Radulovic, 764 So. 2d 878, 879 (Fla. Dist. Ct. App. 2000). "[S]uch duty arises when one party has information that the other party has a right to know because of a fiduciary or other relation of trust or confidence between them." Id. at 880 (quoting State v. Mark Marks, P.A., 654 So. 2d 1184, 1189 (Fla. Dist. Ct. App. 1995)). An exception to this rule is that "[a] duty to disclose may arise where a party undertakes to disclose certain facts, such that the party must then disclose the

---

[2] To the extent the holding in In re Checking diverges from Williams, the latter represents the correct view of Florida law; in fact many jurisdictions follow the same principle that where a contract unquestionably governs a contractual relationship, unjust enrichment claims may not be entertained. See, e.g., Restatement (Second) of Contracts § 373 (1981).

13

entire truth known to him." Marriott Int'l, Inc. v. Am. Bridge Bahamas, Ltd., 193 So. 3d 902, 908 (Fla. Dist. Ct. App. 2015). Rivera does not make any allegations that Ford disclosed certain facts regarding the EVAP system at any time before, during, or after the sale. As a result, Ford only had a duty to disclose the defect with the EVAP system if it was a fiduciary or in another relationship of trust or confidence with Rivera.

Ford notes that it was not Rivera's fiduciary and argues that it did not have any other relation of trust or confidence with him. Rivera argues that a contractual relationship gives rise to a duty to disclose, noting the court's holding in TransPetrol that because there was no "confidential, contractual, or fiduciary relationship" between the company and its lawyers and accountants, there was no duty to disclose. TransPetrol, 764 So. 2d at 880 (emphasis added). As Ford points out, this statement was likely not intended to hold that any and all contractual relationships give rise to confidential relationships. This would create an exception that would swallow the rule that disclosure is only required when a special relationship exists. Courts in Florida have required more than the existence of a contract between parties in determining the existence of a relationship of trust or confidence. See Marriott, 193 So. 3d at 908 ("American Bridge did not argue or introduce evidence at trial to support a finding that a fiduciary obligation, privity, or other type of relationship existed that would have created a duty by Marriott to disclose the funds RCRI had available to finance its contract with American Bridge."); Friedman v. Am. Guardian Warranty Servs., Inc., 837 So. 2d 1165, 1165 (Fla. Dist. Ct. App. 2003) (finding no duty to disclose when the parties had entered into an automobile service contract). Because there was no duty to disclose, Rivera has not pleaded a claim of fraud under Florida law.

Michigan has recognized a doctrine known as "'silent fraud,' also known as fraud by nondisclosure or fraudulent concealment." M&D, Inc. v. W.B. McConkey, 585 N.W. 2d 33, 37

14

(Mich. Ct. App. 1998). Under this doctrine, "silence cannot constitute actionable fraud unless it occurred under circumstances where there was a legal duty of disclosure." Id. As noted above, Ford had no legal duty of disclosure. As a result, Rivera's silent fraud claim under Michigan law fails.

**F. Florida Deceptive and Unfair Trade Practices Act**

Finally, Ford argues that Rivera has not stated a claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") because he failed to allege that Ford's alleged omission about the defective purge valve misled consumers. The Court disagrees.

"In order to assert a claim for damages under FDUTPA, a plaintiff must establish: (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages." State v. Beach Blvd. Auto. Inc., 139 So. 3d 380, 393 (Fla. Dist. Ct. App. 2014). Florida courts define a "deceptive act" within the FDUTPA "as 'a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'" Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc., 169 So. 3d 164, 169 (Fla. Dist. Ct. App. 2015) (quoting PNR, Inc. v. Beacon Prop. Mgmt., Inc. 842 So. 2d 773, 777 (Fla. 2003)). An "unfair practice" is defined as "'one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.'" Id. (quoting PNR, 842 So. 2d at 777). The FDUTPA has "strengthened existing legal protections for consumers by creating a private right of action to seek remedies for various unfair practices and deceptive acts in the conduct of trade or commerce." Velasco v. Chrysler Grp. LLC, No. CV 13-08080 DDP VBKX, 2014 WL 4187796, at *5 (C.D. Cal. Aug. 22, 2014).

Courts have consistently held that "FDUTPA claims premised on a manufacturer's failure to disclose a known, latent defect" are sufficient to survive a motion to dismiss. Chiarelli, 2015

15

WL 5686507, at *17; see also Velasco, 2014 WL 4187796, at *1 (failure to disclose defect with vehicles' electrical systems sufficient to state a claim under FDUTPA); In re Porsche Cars N. Am., Inc., 880 F. Supp. 2d 801, 813 (S.D. Ohio 2012) (failure to disclose defect with plastic coolant tubes constituted a valid claim under FDUTPA); Matthews v. Am. Honda Motor Co., No. 12-60630-CIV, 2012 WL 2520675, at *1 (S.D. Fla. June 6, 2012) (failure to disclose paint discoloration was actionable under the FDUTPA). Doll v. Ford Motor Co., 814 F. Supp. 2d 526, 548 (D. Md. 2011) (FDUTPA claim was meritorious where Ford failed to disclose torque converter defect).

Ford argues that Rivera has not pleaded sufficient facts demonstrating that it knew of the defect within the EVAP system. Although Ford argues that Federal Rule of Civil Procedure 9(b)'s heightened pleading standard applies to Rivera's FDUTPA claims, the prevailing rule seems to be that the rule does not apply. See, e.g., Sanchez-Knutson v. Ford Motor Co., 52 F. Supp. 3d 1223, 1239 (S.D. Fla. 2014) ("While the Court acknowledges that courts within this district have reached various conclusions about the application of Rule 9(b) to FDUTPA claims, this Court is persuaded that Rule 9(b) does not apply to FDUTPA claims.").

In his complaint, Rivera alleges that Ford knew of the defect through a combination of records of consumer complaints, dealership repair records, NHTSA records, warranty and post-warranty claims, and TSBs. Am. Comp. ¶ 41. Courts have held that a manufacturer's knowledge of a latent defect may be inferred when such complaints and records exist. See Catalano v. BMW of N. Am., LLC, 167 F. Supp. 3d 540, 559 (S.D.N.Y. 2016) (finding knowledge of defect had been properly alleged based on complaints to NHTSA, repair records, warranty claims, and TSBs); Velasco, 2014 WL 4187796, at *1 (allowing FDUTPA claim to survive motion to dismiss because of allegation that Chrysler knew of defect through past recalls and recent complaints to NHTSA).

There are some distinctions between Catalano and Velasco and the present case. For instance, the TSB identified by Rivera was not issued until March 2015, nearly two years after Rivera's vehicle was purchased. Further, the earliest of the listed complaints to the NHTSA was not filed until May 2015, two years after Rivera's purchase. However, the complaint states that the listed complaints "are just a small sampling of complaints submitted to the [NHTSA] regarding the Class Vehicles." Am. Compl. ¶ 52. Rivera also alleges that Ford had or should have had knowledge of the defect with the EVAP system based on "the sheer number of reports received from dealerships." Id. ¶ 45. Rivera notes that reports regarding repairs made under warranty are to be sent to Ford "with detailed documentation of the problem and the fix employed to correct it." Id. ¶ 46. Rivera alleges that this data is analyzed by Ford's warranty department and customer relations department. Accepting as true Rivera's factual allegations, and drawing all inferences in his favor, the Court finds that Rivera has sufficiently pleaded Ford's knowledge of the defective EVAP system at the time of sale.

Finally, Ford argues that it was not misleading when it failed to disclose a "safety" defect. In his complaint, Rivera alleges that Ford's "unfair or deceptive acts or practices were likely to deceive reasonable consumers, including Plaintiff and the Florida Class, about the true safety and reliability of the Class Vehicles." Id. ¶ 91. Ford notes a ruling by the Massachusetts Supreme Judicial Court that "a bare assertion that a defendant, while representing the opposite, has knowingly manufactured and sold a product that is 'defective,' or suffers from 'safety-related defects,' does not suffice to state a viable claim." Iannacchino v. Ford Motor Co., 888 N.E.2d 879, 888 (Mass. 2008). The court in Iannacchino held that "[w]hen the standard that a product allegedly fails to meet is not one legally required by and enforced by the government, a claim of economic

17

injury based on overpayment lacks the premise that the purchase price entitled the plaintiffs to a product that met that standard." Id.

Ford argues that, pursuant to Iannacchino, Rivera was required to allege that the defect was in violation of the National Highway Traffic Safety Act, or some other controlling governmental standard, in order to state a claim. However, Iannacchino was decided under Massachusetts law. There is no requirement that a claim alleging an undisclosed, "safety-related defect" must allege a violation of some governmental standard in order for a claim under the FDUTPA to lie. See Smith v. Ford Motor Co., 749 F. Supp. 2d 980, 989 (N.D. Cal. 2010), aff'd, 462 F. App'x 660 (9th Cir. 2011) ("The Court declines to follow Iannacchino. Ford cites to no case authority, and the Court is aware of none, in which a court, applying California law in deciding whether to impose a duty to disclose a safety-related defect, has required a plaintiff to offer evidence of a violation of a standard legally required by and enforced by the government."). Further, like the plaintiffs in Smith, and unlike the plaintiffs in Iannacchino, Rivera has alleged property damage as a result of the alleged defect. See Am. Compl. ¶ 76.

As a result, Rivera has sufficiently pleaded a claim under the FDUTPA.

## IV. CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Ford's motion to dismiss (Dkt. 13). The Court dismisses Rivera's claims for breach of express warranty, breach of the covenant of good faith and fair dealing, unjust enrichment, and fraud. Rivera has withdrawn his claim for violations of the Michigan Consumer Protection Act. As a result, only his FDUTPA claim remains.

SO ORDERED.

Dated: August 15, 2017         s/Mark A. Goldsmith
    Detroit, Michigan        MARK A. GOLDSMITH
                                           United States District Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 15, 2017.

s/Karri Sandusky  
Case Manager
